NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, EX REL. DR. HELENE Z. HILL, <br><br>Plaintiff, <br><br>v. <br><br>UNIVERSITY OF MEDICINE 7 DENTISTRY OF NEW JERSEY, DR. ROGER W. HOWELL and DR. ANUPAM BISHAYEE, <br><br>Defendants. | **Hon. Dennis M. Cavanaugh** <br><br>**OPINION** <br><br>Civil Action No.03-cv-4837 (DMC) |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion for summary judgment by Helene Z. Hill ("Plaintiff") pursuant to Fed. R. Civ. P. 56, and cross-motion for summary judgment by University of Medicine and Dentistry of New Jersey ("UMDNJ"), Dr. Roger W. Howell and Dr. Anupam Bishayee ("Defendants")  Pursuant to Fed. R. Civ. P. 78, no oral argument was heard.  After considering the submissions of the parties, and based upon the following, it is the decision of this Court that Defendant's motion for summary judgment is **granted,** and Plaintiff's motion for summary judgment is **denied.**

**I.     BACKGROUND**

The origin of this case stems from Plaintiff's belief, based on observations that she first made in October 1999, that Defendants had submitted  fraudulent or falsified data to the National Institute

1

of Health ("NIH") as part of a grant application to conduct experiments on the so-called "bystander effect," and subsequently in annual progress reports and in a competitive grant application that was submitted in 2005. Plaintiff has, through the years, reported her observations and suspicions to numerous individuals, oversight committees and governmental agencies including UMDNJ's Committee on Research Integrity ("the Committee"), the Office of Research Integrity ("ORI"), the investigatory arm of NIH, the U.S. Attorney's office and the Defendants themselves. She has steadfastly maintained her contention that data was falsified. Her extensive research and documentation of her underlying claims are nothing short of remarkable, although for the reasons to be discussed, they are ultimately unavailing as a matter of law. The Court notes its belief that Dr. Hill's pursuit of these charges has not been, as Defendants suggest, frivolous or malicious. Nonetheless, Plaintiff's repeated failure to accept the findings of the very oversight committees she sought out has turned this lawsuit into a quest of Quixotic proportions that ultimately must be put to rest.

## II.   LEGAL STANDARD

"A court reviewing a summary judgment motion must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." Gaston v. U.S. Postal Serv., 2009 U.S. App. LEXIS 5673 (3d Cir. 2009). However, "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©.

"A party against whom relief is sought may move at any time, with or without supporting

affidavits, for summary judgment on all or part of the claim." Fed. R. Civ. P. 56(b). "[T]he burden on the moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Cartrett, 477 U.S. 317, 325 (1986). "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56©." Celotex, 477 U.S. at 323 (citing Fed. R. Civ. P. 56©).

> When a motion for summary judgment is properly made and supported, [by contrast,] an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule--set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2). "When the moving party has carried its burden under Rule 56©, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal citations omitted). Indeed, "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." See Schoch v. First Fid. Bancorp., 912 F.2d 654, 657 (3d Cir. 1990). Rule 56(e) permits "a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Id. (quoting Lujan v. National Wildlife Fed'n., 497 U.S. 871, 889 (1990)). "It is clear enough that unsworn statements of counsel in memoranda submitted to the court are even less effective in meeting the requirements of Rule 56(e) than are the unsupported allegations of the pleadings." Schoch, 912 F.2d at 657.

III.   **DISCUSSION**

Plaintiff argues that summary judgment is appropriate based upon the "knowing submission" of false or fraudulent data to the United States Department of Health and Human Services, National Institute of Health ("NIH") in the course of numerous filings (grant application, annual progress reports and competitive renewal grant application) over six years, as well as subsequent alleged retaliatory actions taken against Plaintiff/relator "in the terms and conditions of her employment." (Plaintiff's Brief in Support of Motion for Summary Judgment, pps. 2-3). As a preliminary matter, this Court notes that there are three discrete Defendants in this action, and that there are differences in the legal analysis of the conduct of each with regard to the instant motion for Summary Judgment. Since UMDNJ's role is not delineated by Plaintiff beyond its supervisory role as the employer of the other two Defendants, it need not be separately considered[1], but as to Defendants Howell and Bishayee, the Court will treat each in turn.

A. Defendant Howell

Plaintiff alleges pursuant to the False Claims Act 31 U.S.C.A. § 3729 (FCA) that Defendant Howell, the principal investigator for the NIH grant that gave rise to this litigation, knowingly supplied false or fraudulent information to NIH on October 29, 1999, when the Amended Grant Application ("the grant application") was submitted by Defendant Howell to

---

[1] It should be noted that under the applicable regulations, the grantee institution, UMDNJ, has the primary responsibility for investigating allegations of scientific misconduct and is required to establish internal procedures for conducting such inquiries. 42 C.F.R. §§ 50.103, 50.104. If an allegation of misconduct arises, the grantee institution must conduct an inquiry. 42 C.F.R. § 50.103(d)(1). The institution must then report the results to the ORI and make a recommendation to the ORI about whether an investigation is warranted. 42 C.F.R. § 50.103(d)(1), (4), (6). ORI may seek additional information before addressing the recommendation of the institution. 42 C.F.R. § 50.104(a)(6).ORI may then conduct its own investigation. UMDNJ conducted two inquiries and produced two reports finding that there was insufficient evidence to warrant further investigation, findings that are consistent with the independent investigation conducted by ORI.

NIH. It is useful to examine two preliminary areas in analyzing Plaintiff's initial allegation of fraud, both the knowledge requirement under the FCA, and the specifics of the first grant application to which Plaintiff takes exception.

The FCA sets out several requirements for an action to be brought on behalf of the United States. As an initial matter, the FCA, 31 U.S.C.A. § 3729 (a) (1) (A)(B), applies to any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who " knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim." The FCA goes on to define the scienter requirement. In relevant part, the FCA, 31 U.S.C.A. § 3729(3)(b)(1)(A)(i)(ii)(iii), defines the terms "knowing" and "knowingly" to mean that a person,

> "with respect to information-- **(I)** has actual knowledge of the information;  **(ii)** acts in deliberate ignorance of the truth or falsity of the information; or **(iii)** acts in reckless disregard of the truth or falsity of the information."

In October, 1999, at the inception of the "bystander effect" experiments for which Defendant Howell sought NIH funding, Plaintiff contends that Dr. Howell already had sufficient knowledge, as defined by the FCA, to know that the data he submitted to the NIH in support of his grant application was  false and fraudulent. Plaintiff 's contention that Defendant Howell knowingly submitted false data is based on four elements, as set out in Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment. These include  "the fraud is based upon: (1) the accounts of two eyewitnesses (Hill and Lenarczyk) (2) the inability of both Howell and Lenarczyk (or anyone for that matter) to ever replicate Bishayee's 100% experiments (3) the inability of both Howell and Lenarczyk (or anyone for that matter) to ever replicate Bishayee's

50% experiments [and] (4) the statistical analysis of an expert statistician, Dr. Pitt, that determined there is only a probability of 100 billion to 1 that Bishayee's Coulter counts were not fabricated." (Page 6)

With regard to the first element, the accounts of two eyewitnesses, as recounted in the undisputed facts submitted by the parties, as of October, 1999 Plaintiff *alone* noticed Dr. Bishayee conducting research that she found suspicious. It is significant to note that it was not until April, 2001 that Plaintiff believed she had enough information to approach UMDNJ's Committee on Research Integrity (" the Committee") with a request that they investigate. In Plaintiff's "Introduction to the Committee" (Plaintiff's Exhibit 39, Attachments to ORI Report 2001-28, page 000336) she describes that when she had "reason to believe that Dr. Bishayee had made up the results, I reported this to Dr. Howell, *but he did not believe the results were fudged*."(emphasis added) In fact, Plaintiff Hill continues, at that time "I was not absolutely certain that my results were correct." Moreover, she reports that she was "the new kid on the block, so to speak, and I was in the position of myself being suspected of being overly suspicious and probably wrong."  This Court must conclude that by Plaintiff's own statements, Defendant Howell did not have knowledge as required by the FCA that data was fraudulent or fabricated, nor did he act recklessly. It was, so to speak, Plaintiff's word against Defendants, and there was no data for Howell to weigh in choosing to credit or discredit Plaintiff's belief. At the inception of the alleged fraud there was nothing more than Plaintiff's "observations and suspicions" (Plaintiff's Amended Complaint, Doc. 36, page 8) that might have alerted Dr. Howell to a problem.  In fact, not only were there not two eyewitnesses at this crucial stage, of the four factors that Plaintiff identifies as evidence of the alleged fraud none were present in October,

6

1999. The second eyewitness, Dr. Lenarczyk, upon whom Plaintiff relies to corroborate her allegations, had not yet been hired, and therefore had neither observed Dr. Bishayee nor attempted to replicate the results of his experiments. In fact, Dr. Lenarczyk was not hired until July 2000 "subsequent to the approval and funding of Howell's grant." (Plaintiff's Amended Complaint, Doc. 36, p. 9) It appears that one of the purposes for which Dr. Lenarczyk was hired was to perform trials to replicate the data reported in the grant application.[2]

The second and third factors, the inability to replicate data in the 50% and 100% experiments, is likewise inapposite to Plaintiff's contention that Defendant Howell knowingly submitted false and fraudulent data to the NIH. The question of replicating data was analyzed in a case that both parties rely on in their briefs. In *U.S. ex rel. Milam v. Regents of University of California*, 912 F.Supp. 868, 889 (D.Md.,1995),[3] the Court held that "awareness of [Milam's] variant results was not sufficient as a matter of law to render their submissions to be false statements." This is critical, especially in conjunction with Dr. Lenarczyk's deposition testimony wherein he states that when "I couldn't confirm the data...I was asking myself maybe I'm doing something wrong..." To put it another way, the fact that results could not be replicated is proof only that the results could not be replicated, especially in light of Dr. Lenarczyk's observation that the experiment involved "a very precise treatment. But the treatment by itself is very (*sic*)

---

[2] *See* Plaintiff's Exhibit 55, Deposition of Marek Lenarczyk, page 61, lines 21-25. It seems peculiar to imagine that Dr. Howell would have asked Dr. Lenarczyk to replicate experiments that he knew were fraudulent and incapable of replication .

[3] The Court in Milam (P. 889) concluded that if there were an obligation to report conflicting results "scientists would be forced to disclose all varying results to NIH, no matter what indicia of credibility those results had," which would obviously burden the NIH's resources.

influential by the hand who is doing that treatment." Moreover, the Office of Research Integrity ("ORI"), the Federal investigative arm of NIH to whom Plaintiff reported her suspicions after the Committee's first investigation[4], found that "in the absence of additional evidence of their falsification, this question [whether the results of the bystander effect experiments could be replicated] would not be a PHS issue of scientific misconduct,"(ORI Report 2001-28, page 000278) The fact that numerous experiments yielded variant results barely rises to any level of inference, much less to the level at which Defendant Howell's submission of the data was cognizable under the FCA . The final factor introduced by Plaintiff, the statistical analysis done by Plaintiff's expert, Dr. Joel Pitt, was done subsequent to the ORI investigation, and therefore could not have contributed to Defendant Howell's knowledge as of October, 1999. The reports and power point presentations that Dr. Hill presented to the United States Government in her efforts to convince them to intervene in this *qui tam* action, the deposition of her expert witness, Dr. Michael Robbins, the voluminous scientific articles submitted in Plaintiff's exhibits and Plaintiff's own assertion that "it was biochemically and radio-biologically impossible for the outcome of Bishayee's 100% experiments to occur" (Plaintiff's Brief in Support of Motion for Summary Judgment, page 19) were likewise not known to Dr. Howell when he applied for the NIH grant.

Subsequent to Plaintiff's initial suspicions there were three independent investigations,

---

[4] The Office of Research Integrity is an "independent entity in the Department of Health and Human Services," 42 U.S.C. § 289b. ORI replaced the Office of Scientific Integrity ("OSI") "which oversees the implementation of all PHS policies and procedures related to scientific misconduct; monitors the individual investigations into alleged or suspected scientific misconduct conducted by institutions that receive PHS funds for biomedical or behavioral research projects or programs; and conducts investigations as necessary." 42 C.F.R. § 50.102.

the first Committee report, issued on June 1, 2001, the ORI report, issued on September 5, 2002 and the second Committee report, issued on March 10, 2003. After each subsequent rejection of her claims, Plaintiff responded by offering more and more evidence that purported to prove her initial suspicions of scientific misconduct. However, this exercise has done nothing to further her contention, an essential element of her claim, that Defendant Howell had sufficient knowledge or acted recklessly for purposes of the FCA. Even if hindsight proved that Dr. Howell had been mistaken, and that the data was indeed false, his decision to disregard Plaintiff's suspicions, suspicions of which she herself was not sure the import was reasonable, and was not reckless. Thus, even accepting Plaintiff's criteria for the existence of fraud, it is impossible to conclude that Dr. Howell had the requisite knowledge or intent to submit false or fraudulent data to NIH in October, 1999.

In order to establish a prima facie case under the FCA sufficient to avoid summary judgment, there are three elements that a plaintiff/relator "must prove: '(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *United States ex rel. Hefner v. Hackensack Univ. Med. Center*, 495 F. 3d 103, 109 (3d Cir. 2007) (*quoting Hutchins v. Wilentz, Goldman & Spitzer*, 253 F. 3d 176, 182 (3d Cir. 2001)). Because the knowledge requirement is clearly lacking, this Court need look no further at the underlying claim of scientific fraud as to Defendant Howell, at least insofar as the grant application that was approved by NIH. Subsequent to the 1999 application, Howell sent annual progress reports as required by the NIH, and then re-applied for additional funding in a competitive grant application process that was approved in 2005. Plaintiff would have this Court believe that each of those

filings represent distinct, cognizable submissions of fraudulent data actionable under the FCA. However, it is impossible to square that contention with events that occurred after 1999, especially the first and second Committee Reports, as well as the findings of the ORI. At every stage along the way, the ability of Plaintiff to demonstrate that Defendant Howell acted "knowingly" or "recklessly" becomes more and more unlikely. The Court in *Milam* held that "the [ORI] report is relevant and highly probative in that it is a detailed report, written by a scientific oversight agency, on the precise issue before this Court." (Id. At 880) While the Court held that the ORI report did not have preclusive effect, it did find ORI reports to be probative and reliable. This Court therefore holds as a matter of law that Defendant Howell was entitled to rely on the ORI report to the extent that "there is insufficient evidence to warrant further investigation," and thus to conclude that the data he was submitting was not the product of fraud. (ORI Report 2001-28, p. 000278) Because it was reasonable for him to believe that the data he submitted had been scrupulously examined and found not to have sufficient credible evidence of fraud, there was no recurring bad faith conduct in continuing to use the same data in future submissions to NIH. Defendant Howell can not reasonably be charged with knowledge that Dr. Bishayee had fabricated data; any suspicions that either he or Plaintiff might have had ought to have been put to rest after these investigations. The fact that Plaintiff steadfastly disregards the conclusions of three separate investigations by two autonomous institutions is not evidence that Defendant Howell should have done the same. To the extent that each of Howell's filings to the NIH, as well as his published results, constitute individual allegations of fraud, based on the lack of any evidence that Howell either did or should have suspected wrongdoing in the compilation of the data he submitted, each is equally without merit.

B. Defendant Bishayee

In addition to the three elements necessary to form a prima facie case that can survive summary judgment under the FCA, there is another threshold requirement to proceed under the FCA. In *U.S. ex rel. Berge v. Board of Trustees of the University of Alabama,* 104 F. 3d 1453, 1459 (C.A. 4 Md.),1997) the Court held that "we have previously suggested that the civil False Claims Act requires a materiality element. *See United States v. Snider,* 502 F.2d 645, 652 n. 12 (4th Cir.1974) (construing the FCA's predecessor statute, 31 U.S.C. § 231). If previously unclear, we now make explicit that the current civil False Claims Act imposes a materiality requirement. *See also Tyger Constr. Co. v. United States,* 28 Fed. Cl. 35, 55 (1993) ( "[T]he FCA covers only those false statements that are material."). With respect to Defendant Howell, this Court considered the scienter requirement. With regard to Defendant Bishayee, it now turns to the element of materiality and its relationship to claims of research misconduct..

UMDNJ, in its manual entitled "Policy on Research Misconduct" (code #00-01-05-10:15, page 1) defines research misconduct as follows:

> **Research misconduct** – fabrication, falsification or plagiarism, committed intentionally, knowingly or recklessly, in proposing, performing or reviewing research, or in reporting research results. Research misconduct does not include honest error, conflicting data, differences of opinion, or differences in interpretations or judgments about data or experimental design.[5]

In March, 2001, Plaintiff first became aware that Dr. Lenarczyk shared her concerns

---

[5]This is virtually identical to the definition of research misconduct adopted by the Office of Research Integrity ("ORI"), the Federal investigative body to whom Plaintiff next turned to with her suspicions in 2002. Scientific misconduct is defined in the PHS regulations at 42 C.F.R. § 50.102 as "fabrication, falsification, plagiarism or other practices that seriously deviate from those that are commonly accepted within the scientific community for proposing, conducting, or reporting research. It does not include honest error or honest differences in interpretations or judgments of data."

about the experiment that was covered by Grant No. R01CA83838. She and Dr. Lenarczyk set out to document their suspicions, and when they felt that they had sufficient evidence they approached Defendant Howell and Dr. Stephen Baker, the Radiology Department Chair. Plaintiff then approached UMDNJ's Campus Committee on Research Integrity (" the Committee"), and they commenced an investigation. In addition to interviewing all of the parties, the Committee also sequestered all of the material from Howell's laboratory on the same day, April 10, 2001, that Plaintiff first apprised the Committee of her suspicions.

Based on the information supplied by Plaintiff, and the material that was sequestered from Dr. Howell's laboratory[6], the Committee conducted an investigation and subsequently issued a unanimous report which concluded that there was no cause to warrant further proceedings. Although Plaintiff objects that the Committee was not informed that the results of Bishayee's experiments had not been replicated, the policy of the Committee seems to belie the importance she attaches to that omission, since "conflicting data" is specifically mentioned as something which does not rise to the level of research misconduct.[7] In fact, the Committee's findings raised more questions about Plaintiff's conduct than it did about that of any of the Defendants. The Committee found that Plaintiff "began to secretly monitor and photograph Dr. Bishayee's experiments." (Plaintiff's Exhibit 39, ORI Report 2001-28, page 000302) The

---

[6]"The materials sequestered included: 32 binders, 4 notebooks, 46 diskettes, 7 zip disks and 38 Petri plates. Dr. Hill provided to Dr. Raveche a binder containing written allegations, narratives, diaries, photographs, copies of original data from Dr. Bishayee's notebook, and other data from Dr. Hill's records. Later, the Committee obtained additional materials: the relevant NIH grant application, publications on which the grant was based, publications appearing subsequent to funding of the grant that reported on data developed under the grant, abstracts pending presentation, and biographical sketches for the principals." (ORI Report 2001-28, page 4, Plaintiff's exhibit 38)

[7]Although Dr. Hill repeatedly alleges that Defendants were obligated to report their inability to replicate the results of the 50% and 100% experiments, that is not a requirement of either the NIH or UMDNJ.

Committee was also "concerned with inconsistencies in Dr. Lenarczyk's remarks" as well as "actions by Dr. Hill and Dr. Lenarczyk [that] may have interfered with Dr. Bishayee's experiment." Although Plaintiff relies on the corroboration of her colleague, the Committee found that Plaintiff's testimony "conflicted with that of Dr. Lenarczyk as to dates, their observations of Dr. Bishayee's helena tubes, and what they did with Dr. Bishayee's experimental materials in their attempt to collect evidence of misconduct in the March 26-30, 2001 experiment." Moreover, "Dr. Hill and Dr. Lenarczyk admitted to tampering with Dr. Bishayee's March 26-30, 2001 experiment, possibly before it was completed." These disturbing revelations from Plaintiff's own exhibits (ORI Report 2001-28, page 000310) were contained in the Committee's report issued in June, 2001. Subsequent to that report, Plaintiff contacted the ORI and they too undertook an investigation, reviewing both the Committee findings and the original materials and evidence that had been sequestered and produced for the Committee's investigation.

The ORI report addresses the issue of materiality and concludes that the data which Plaintiff believes to have been fabricated was not integral to the decision by NIH to approve the grant application. First, the report makes the following observation:

> "The data for the experiment that Dr. Hill had done in September, 1999 with Dr. Bishayee (Experiment #1, 09/06/99 to 09/28/99) was also submitted to the Committee by Dr. Hill(Attachment 3d, pp. 10-16). The results Dr. Hill obtained (see graph, Attachment 3d, p. 10) showed no reliable increase with dose in mutants/cell in the cells irradiated under hypoxic conditions, i.e. as clusters (cell pellets, filled squares), and did show an increase in mutants/cell when the cells were irradiated in suspension(aerobic condition)(filled circles). This experiment supports the statement in the text of the grant application that cells in suspension were more sensitive to the mutagenic and toxic effects of irradiation than cells left in pellets. *Thus, the result obtained by Dr. Hill in the mutation arm of experiment #1, even with rather erratic values for the (hypoxic) clustered cells, did not*

> *contradict the statements in the grant application. Dr. Hill was not objecting to the results Dr. Bishayee claimed to have obtained as wrong or contradictory result; her objection was that he had obtained his results by fabrication of this data (Attachments 1 and 1a).* (emphasis added) (ORI 2001-28, 000272).

This excerpt from the ORI report suggests that Plaintiff's real objection is to Defendant Bishayee's methodology rather than his results,[8] something which is explicitly outside the scope of research misconduct as defined by the ORI and the Committee, but even more tellingly indicates that the data in the grant application, even if questionably produced, did not adversely affect the review of the grant conducted prior to its approval by NIH. As such, it could not have been material. Moreover, although ORI was somewhat critical of the Committee's methodology and findings, two things are clear from their report; first, that "in the absence of additional evidence of their falsification, this question [whether the results of the bystander effect experiments could be replicated] would not be a PHS issue of scientific misconduct,"(ORI Report 2001-28, page 000278) and second, that the main results which Plaintiff claims to have been falsified, the Coulter counts, "were not data that was reported as results; they were only used as guides for the implementation of the protocol." (ORI Report 2001-28, page 000274) It is unreasonable that data not reported as results, whether the result of good, bad or indifferent science, could have been material to the grant approval by NIH in 1999. It is worth noting that the ORI report also documents sloppiness in the preparation of the grant application such that there was a "contradiction between actual or stated results and its graphic presentation in the grant application," and concludes that this "may have been due to honest error or just

---

[8] In "Plaintiff's Brief in Support of Motion for Summary Judgment," Plaintiff notes that "while the Defendants may attempt to show other research showing the existence of the bystander effect, they cannot show it was demonstrated using the protocols that Bishayee did which Howell and Lenarczyk could not replicate after 22 attempts." (P. 28)

carelessness, since it did not support the text very well." Even taking the dimmest possible view of Defendant Bishayee's research conduct, there is no evidence that the data submitted to NIH had any material effect on their decision to grant. Moreover, once the ORI became involved in 2001, NIH was reasonably on notice of Plaintiff's allegations, and yet they extended and re-funded the grant through 2010. Although this issue was not thoroughly briefed by the parties, this Court takes notice of the opinion in *Boisjoly v. Morton Thiokol, Inc*. 706 F.Supp. 795, 809 (D.Utah,1988) that "because FCA liability requires an element of fraud or falsity, courts have disallowed FCA claims where the Government knew, or was in possession at the time of the claim, of the facts that make the claim false." *See, e.g., United States v. Fox Lake State Bank,* 366 F.2d 962, 965 (7th Cir.1966); *Woodbury v. United States,* 232 F.Supp. 49, 54-55 (D.Or.1964), *modified,* 359 F.2d 370 (9th Cir.1966); *United States v. Schmidt,* 204 F.Supp. 540 (D.Wis.1962).

     C. Plaintiff's Claim of Retaliation

        In order to form a prima facie case for retaliation under the FCA that can survive a motion for summary judgment, Plaintiff must make a sufficient showing that she was engaged in "protected conduct," that as a result she was subject to adverse employment action, and that there is a causal nexus between Plaintiff's actions and Defendant's alleged discrimination or retaliatory behavior. (See *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997). A materially adverse action is one that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Turner v. Schering-Plough, Corp.*, 901 F. 2d 335(3d Cir., 1990). Moreover, "a causal connection between protected activity and adverse action may be inferred from: (1) an unusually suggestive temporal proximity between the two; (2) an intervening pattern of antagonism following the protected conduct; or (3) the proffered evidence

examined as a whole." *Sullivan v. Nationwide Life Ins. Co. of America*, 2010 WL 2654673, 20 (D.Del.,2010) Moreover, as the Supreme Court held in *Burlington Northern & Santa Fe Railway Co. V White*, 548 U.S. 53, 67 (2006), federal law "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Moreover, engaging in protected conduct "cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience."*Id.* At 67.

An examination of the evidence as a whole in this case reveals nothing other than Plaintiff's allegation that she was forced to share space with a colleague and was locked out of the larger laboratory that she was accustomed to having access to, that she has been "shunned" and excluded from meetings and otherwise "humiliated." (ECF Document 43, page 42). Although Plaintiff's brief examines the standard for "protected conduct," it does not deal with the fact that Defendant offers a plausible alternative explanation for the one potentially cognizable materially adverse employment action, the change of laboratory access. Moreover, Plaintiff's exhibits demonstrate that locks on the lab had been changed previously not to punish or retaliate against Plaintiff, but rather to investigate her accusations without the fear that she or any of the other scientists might tamper with the results.(Deposition of Dr. Lenarczyk, page 72) Although the Committee Report indicated that Dr. Hill had spied on Dr. Bishayee and possibly tampered with his experiment to collect data on the purported fraud, she was not denied lab access at that point. Only subsequently, when the Radiology Department was apparently re-organized, were the lab spaces reassigned. Unlike Drs. Bishayee and Lenarczyk, neither of whom is still employed by UMDNJ, Dr. Hill retains her title and salary, and continues, to the best of the Court's knowledge, to be employed at UMDNJ, enjoying the same salary and benefits that she

16

did prior to the commencement of this action. We need not reach the issue of whether Dr. Hill engaged in "protected conduct" because the evidence of materially adverse employment action or discrimination of any kind sufficient to defeat a motion for summary judgment is lacking.

### IV.     CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is **denied,** and Defendants' motion is **granted.**  Plaintiff's complaint is **dismissed** with prejudice. An appropriate order follows this opinion.

S/ Dennis M. Cavanaugh<br>Dennis M. Cavanaugh, U.S.D.J.

Date:        October  18 , 2010
cc:           Counsel of Record
              The Honorable Mark Falk, U.S.M.J.
              File